Filed 2/28/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARK GERAGOS et al., <br><br>    Cross-complainants and Appellants, <br><br>      v. <br><br>ARMEN ABELYAN et al., <br><br>    Cross-defendants and Respondents. | B310636 <br><br> (Los Angeles County <br> Super. Ct. No. 19STCV40558) |

    APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Affirmed.

    Dhillon Law Group, Krista L. Baughman and Harmeet K. Dhillon for Cross-complainants and Appellants.

    Affeld Grivakes, Damion D. D. Robinson; Law Offices of Elliott N. Tiomkin and Elliott N. Tiomkin for Cross-defendants and Respondents.

————————————

# INTRODUCTION

With new counsel, a client sues his former attorneys, alleging they accepted $27,500 in fees from him but did not perform the promised legal services. New counsel engages in communications via email and telephone with the former attorneys' representative and discusses the possible filing of a State Bar claim. The former attorneys file a cross-complaint against the client and his new counsel for extortion, among other claims. The client and his new counsel file an anti-SLAPP motion, which the trial court grants.

We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

I.    *Events Leading to Filing of Civil Complaint*

From 2007 to 2011, Armen Abelyan (Abelyan) was a revenue agent with the IRS. In September 2011, he began training as a special agent. Prior to receiving his formal commission as a special agent, Abelyan received a traffic ticket and tried to use his status as a special agent "to get out of the ticket" both at the time of citation and during his traffic court appearance.

In 2014, Abelyan was charged with perjury and attempted impersonation of a public officer in Los Angeles Superior Court case No. BA430254-01, *People v. Abelyan*. The prosecution argued Abelyan "lied about being a Special Agent and falsely impersonated a public officer in trying to get out of the ticket." Initially, Abelyan represented himself in the case, but realized he needed a lawyer for trial.

2

On November 19, 2015, Abelyan paid $2,500 for a consultation with Setara Qassim (Qassim) and Mark Geragos (Geragos) of the firm Geragos & Geragos (Geragos Firm). The consult lasted less than 15 minutes. They "agreed to take [the] case and requested an additional $25,000." That same day, Abelyan paid and signed a retainer agreement, which included the following relevant provisions: "This letter will serve as confirmation that the [Geragos Firm] will represent you related to the matter pending against you in Clara Shortridge Foltz Criminal Justice Center, Department 114." "You retain and employ our firm to represent you in the matter referenced above. Our firm shall charge you a flat fee of $25,000.00 for investigation only. If you wish that our firm be substituted in as counsel of record, a new retainer agreement will need to be negotiated." "Said FEE is a FLAT FEE which covers not only the legal services to be rendered but also secures the FIRM'S representation and reputation to assist you with this matter. A FLAT FEE is not based upon actual time spent on the case or the number of hours billed, but covers services that might be greater or lesser than the average for this type of case." (Boldface omitted.) Geragos and Qassim assured Abelyan he "had nothing to worry about and that an attorney would show up the next day at trial."

The next day, on November 20, 2015, Abelyan waited outside the courthouse but no one from the Geragos Firm showed up. Abelyan called Qassim multiple times but she did not respond. Abelyan went into court by himself and discovered the judge had issued a bench warrant for not timely appearing at trial. He represented himself for the remainder of the trial, which resulted in a hung jury.

Abelyan contacted the Geragos Firm again and was instructed by Qassim to "wait and see" whether the prosecutor retried the case. When the charges were refiled, neither Qassim nor Geragos (nor anyone else from the Geragos Firm) provided services on Abelyan's behalf. Abelyan had exhausted his funds to pay the Geragos Firm and had no choice but to proceed with appointed counsel. Abelyan was convicted in the retrial and sentenced to four days in jail and probation.

Following the retrial, Abelyan contacted the Geragos Firm (and Geragos directly) several times and requested a refund of the retainer because they failed to provide any services.

On November 18, 2016, Abelyan sent a letter to Geragos, which provides in relevant part: "Mr. Geragos, I ask that you refund me the $25,000 retainer I paid on November 19, 2015." Qassim "sensed desperation in me, . . . saw the money and took it. But she took it knowing she was never going to represent me. She never asked for any documents and I didn't see her till weeks after my [first] trial . . . . The DA did re-file, but [Qassim] was elusive. My phone calls were not returned. Out of options, I was assigned [appointed counsel]." "After the second trial ended . . . I came to the lobby repeatedly and demanded to see you." The downstairs sign-in record shows "how many times I've been in the lobby asking to see you or [Qassim]. There must be a record of . . . two dozen calls and voicemails. I was given a runaround of a year." "I am not trying to argue a contract with one of the most powerful attorneys in L.A., but consider the circumstances and the first sentence" of the retainer, which provides the Geragos Firm " 'will represent you related to the matter pending against you.' " At our meeting, you "calmed me down, you made me feel safe. Well worth the $2,500, but the $25,000 wasn't earned.

4

There was no representation or investigation or intent ever to do either." "I know $25,000 isn't a lot of money to you or the firm, but to me right now it will make all the difference. . . . Please refund the $25,000." The money was not refunded.

Abelyan reported the Geragos Firm to a number of bar organizations. He also retained Elliott N. Tiomkin of the Law Offices of Elliott N. Tiomkin (Tiomkin) to recover the retainer from the Geragos Firm.

On November 8, 2019, Abelyan filed a civil complaint against Geragos, Qassim, and the Geragos Firm (collectively, the Geragos Parties) for breach of contract, promissory fraud, and unlawful business practices (per Bus. & Prof. Code, § 17200). The record on appeal does not contain a copy of Abelyan's complaint.

II.    *Cross-Complaint*

On August 21, 2020, the Geragos Parties, represented by Greg Kirakosian (Kirakosian), filed a cross-complaint against Abelyan, Tiomkin, and his firm, asserting five causes of action: (1) civil extortion, (2) conspiracy to commit extortion, (3) negligence, (4) intentional infliction of emotional distress, and (5) violation of Business and Professions Code section 17200. The cross-complaint alleged the following:

On August 13, 2020, Kirakosian emailed Tiomkin to meet and confer regarding the Geragos Firm's intention to file a demurrer, a motion to strike Abelyan's complaint, and a motion for sanctions. Tiomkin responded that same day, "making additional frivolous claims . . . while simultaneously raising the issue of State Bar violations against the Geragos Firm."

The next day, on August 14, 2020, Kirakosian called Tiomkin. Tiomkin "was uninterested in conducting a meet and

confer and . . . only discuss[ed] the immediate filing of a State Bar complaint against the Geragos Firm." Kirakosian requested that Tiomkin "refrain from making such veiled threats." The conversation ended when Tiomkin stated the Geragos Firm should return the $27,500 back to Abelyan "or Abelyan would be immediately filing a State Bar complaint." Kirakosian then emailed and informed Tiomkin "all future phone conversations must be conducted with the presence of a certified court reporter."

On August 18, 2020, Tiomkin "directly . . . contacted Alexandra Kazarian of the Geragos Firm" to discuss the case, in violation of Rule 4.2 of the California Rules of Professional Conduct.[1] Alexandra Kazarian (Kazarian) is described in the cross-complaint as "an internal colleague" of the Geragos Firm and "a representative of the Geragos Firm." According to Kazarian, Tiomkin made the following "settlement proposal" four times during their telephone call: " 'If the Geragos [F]irm pays $27,500.00, he will not report the matter to the State Bar and the case would be dismissed with confidentiality.' "

Based on the foregoing, the first cause of action in the cross-complaint alleged Tiomkin and Tiomkin's Firm "made

_____

[1] Rule 4.2(a) of the Rules of Professional Conduct provides: "In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." (Cal. Rules of Prof. Conduct, rule 4.2(a).)

Further undesignated rule references are to the California Rules of Professional Conduct.

6

repeated attempts to extort funds from the Geragos Firm on Abelyan's behalf." By "means of threats to present disciplinary charges in exchange for the immediate payment of $27,500.00," Tiomkin violated Rule 3.10 and Penal Code section 524.[2] The second cause of action alleged Abelyan, Tiomkin, and Tiomkin's Firm "actively participated with each other in a plan to extort funds" from the Geragos Parties "based on false and baseless claims as well as threats of complaints to the State Bar."

The third cause of action alleged Abelyan, Tiomkin, and his firm "breached the duty of care owed" to the Geragos Parties and "caused [the Geragos Parties] to suffer injuries." The fourth cause of action alleged Abelyan and Tiomkin "knew" Abelyan's claims against the Geragos Parties were "not only false, but were fabricated and used to make unlawful threats of State Bar violations in an effort to extort the Geragos Firm." Their "unlawful and criminal conduct was extreme and outrageous" and could "disrupt the Geragos Firm's reputation and business."

The fifth cause of action alleged Tiomkin and his firm violated Business and Professions Code section 17200 when Tiomkin "used his position as an attorney to attempt to file false claims against [the Geragos Parties] and threatened them with false and malicious complaints . . . to the State Bar . . . if they did

---

[2] Rule 3.10(a) provides: "A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

Penal Code section 524 provides: "Every person who attempts, by means of any threat, . . . to extort property or other consideration from another is punishable."

not pay his client tens of thousands of dollars." Tiomkin knew the Geragos Parties had legal representation, yet he contacted Kazarian "in an attempt to circumvent [Kirakosian] and extort [the Geragos Parties] directly."

The Geragos Parties sought general damages, special damages, punitive and exemplary damages, attorney fees and costs.

III.    *Special Motions to Strike the Cross-Complaint*

Abelyan, Tiomkin, and his firm filed special motions to strike[3] the Geragos Parties' cross-complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, Code of Civil Procedure section 425.16.[4]  They argued the causes of action in the cross-complaint arise out of "privileged litigation conduct" in connection with Abelyan's civil complaint and settlement discussions, and as such, the claims should be stricken under section 425.16.  They also argued the Geragos Parties cannot demonstrate a probability of prevailing on their claims because the litigation privilege per Civil Code section 47 applies.  Their motions included a request for attorney fees and costs per section 425.16, subdivision (c).  Supporting declarations of Abelyan and Tiomkin, as well as various exhibits, were filed also.

---

[3]    Tiomkin filed an anti-SLAPP motion on September 30, 2020, and Abelyan filed a nearly identical anti-SLAPP motion on October 8, 2020.

[4]    Undesignated statutory references are to the Code of Civil Procedure.

8

Abelyan's declaration iterated the information included in part I above, entitled "Events Leading to Filing of Civil Complaint."

Tiomkin's declaration provided:

Before filing suit on Abelyan's behalf, Tiomkin attempted to resolve the matter with the Geragos Firm and had discussions with Kirakosian and Kazarian, "who purported to represent the Geragos Firm and Mark Geragos." Throughout these discussions, "Kirakosian acted as the 'bad cop,' taking a very aggressive approach that the Geragos Firm had no possible liability" while "Kazarian appeared more willing to engage in a reasonable discussion and potentially to resolve the matter." Neither ever suggested that Tiomkin should not contact Kazarian or should deal only with Kirakosian.

On August 13, 2020, Tiomkin received a "meet and confer" letter from Kirakosian—providing notice of the Geragos Parties' intent to file a demurrer and motion to strike Abelyan's complaint and threatening to seek sanctions against Abelyan and Tiomkin personally. Kirakosian's letter, attached as an exhibit, characterized Abelyan's complaint as "fraudulent" and "frivolous." Kirakosian's letter urged Tiomkin to refer to 1) the Geragos Firm's retainer agreement signed by Abelyan on November 19, 2015, and 2) Abelyan's November 18, 2016 letter to Geragos—both of which were attached as exhibits.

At no point during the discussions held August 13 and 14, 2020 did Tiomkin threaten to report the Geragos Parties to the State Bar or to pursue State Bar proceedings against them. Kirakosian and Tiomkin "did discuss Mr. Geragos' history of State Bar investigations relating to similar conduct—*i.e.,* taking client funds without performing services." Tiomkin "believed

9

these investigations would be relevant to show a pattern and practice" and "intend[ed] to seek information about these investigations in discovery."  Kirakosian, however, refused to discuss any State Bar-related investigations into the Geragos Firm.  Email communications between Tiomkin and Kirakosian were attached as exhibits.

Given Kirakosian's "antagonistic tone," Tiomkin contacted Kazarian on August 18, 2020 to ascertain "whether she would still be amenable to trying to resolve this matter."  Kazarian "at no point suggested that she could not talk . . . about the case, or that [Tiomkin] should talk with [Kirakosian]."  Tiomkin "did not threaten a State Bar complaint or proceeding during [his] conversation" with Kazarian.  At some point, Kazarian "stepped away for a few minutes, stating that she wanted to consult with another attorney" and upon her return, "immediately and repeatedly brought up the possibility of a State Bar complaint and asked whether [Abelyan and Tiomkin] were planning to file one."  Tiomkin advised that they "had not decided at that point."  Kazarian told Tiomkin "in no uncertain terms that if [they] were going to settle this case, the settlement would have to include an agreement that [Abelyan and Tiomkin] would not report to the State Bar."  Tiomkin told Kazarian that he did not think they "could validly agree to refrain from reporting attorney misconduct, and likely could not make this a part of a settlement agreement."  Kazarian brought up State Bar proceedings "at least three times" during this conversation, "all following the break in [their] conversation."  Tiomkin's "only mention of a potential State Bar proceeding was in response to [Kazarian's] direct questions."

10

IV.    *Opposition to the Special Motions to Strike*

On October 29, 2020, the Geragos Parties filed an opposition to the special motions to strike.  They argued extortionate conduct is not protected by the anti-SLAPP statute and relied on Rule 3.10 and the exception established in *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*) in support.  They argued case law "make abundantly clear that *Flatley* should not be read to be limited to . . . only 'specific and extreme circumstances' of extortion" and that "veiled or 'less than explicit' threats . . . did not prevent the *Flatley* exception from applying and would not make the conduct protected."  They contend Tiomkin's "explicit threats of State Bar complaints are completely unrelated to the underlying claims in the Complaint."  They also contend that admissible evidence, i.e., a partial audio recording (and transcript) by Kazarian of her telephone conversation with Tiomkin, "conclusively demonstrates extortion as a matter of law."  Finally, the Geragos Parties argue the litigation privilege did not apply to Tiomkin's statements to Kazarian, and that they can establish a probability of prevailing on the merits of their causes of action.

Supporting the opposition to the anti-SLAPP motion were the declarations of Geragos, Qassim, Kazarian, and Kirakosian.

Geragos's declaration provides: Kirakosian informed Geragos that Tiomkin "made repeated statements concerning State Bar complaints against [Geragos] as well as other repeated statements that [he] would be in custody soon."  Geragos had "not retained the services of [Kazarian] in connection to this matter nor [had he] ever requested or authorized her to speak with [Tiomkin] on [his] behalf."  Geragos learned from Kazarian that Tiomkin "repeated his threats to report [Qassim] and [him] to the

11

State Bar if [they] did not immediately pay [Abelyan] $27,500.00." Geragos "felt extreme embarrassment" that Tiomkin contacted "a fellow colleague who had zero involvement in this dispute to discuss State Bar complaints against [him]." He "began having difficulty sleeping" and became "nervous, worried and anxious . . . because [he] believed . . . Tiomkin and [Abelyan] would attempt to fabricate false criminal charges and file a frivolous State Bar complaint against [him] in order to obtain a settlement." Geragos subsequently learned that Abelyan's and Tiomkin's "extortion had been completed and [had] indeed made the false allegations against [him] and [Qassim] to the State Bar."

Qassim's declaration repeats the statements from, and is nearly identical to, Geragos's declaration.

Kirakosian's declaration includes as exhibits a copy of email communications from Tiomkin and a transcript of the audio recording of Kazarian's phone conversation with Tiomkin. The declaration and exhibits provide: On August 13, 2020, Kirakosian emailed Tiomkin to meet and confer regarding the Geragos Parties' intention to file a demurrer and motion to strike. In response, Tiomkin "raised the issue of State Bar violations" and requested "documents concerning relevant State Bar investigations of [Geragos] and his associates pertaining to his theft of client funds." Tiomkin's emails also stated, "I hope Mr. Geragos is staying well. Has he managed to remain out-of-custody," and referred to Geragos's recent "indictment as an unnamed co-conspirator in the Avenatti case." Tiomkin wrote that the fee agreement "violates multiple State Bar rules" and requested that Kirakosian "should familiarize [himself] with the State Bar's position on true retainers." During Kirakosian's

phone call with Tiomkin on August 14, 2020, Tiomkin "unequivocally stated that his client would be filing a State Bar complaint if the matter wasn't promptly resolved." Kirakosian emailed Tiomkin and memorialized their phone conversation, to which Tiomkin replied that Kirakosian had "mischaracterized the conversation in its entirety." On August 18, 2020, Kirakosian was informed by Kazarian that Tiomkin reached out to her directly to discuss the case. Kazarian told Kirakosian about Tiomkin's "settlement proposal"—"If the Geragos Firm pays $27,500.00, [Tiomkin] will not report the matter to the State Bar and the case would be dismissed." Kirakosian told Kazarian that the settlement proposal "mirrors the threats" Tiomkin made to Kirakosian during their previous communications. Kazarian told Kirakosian she recorded the phone conversation and gave him the recording.

Kazarian's declaration provides: On August 18, 2020, she received "an unsolicited call" from Tiomkin wanting to discuss Abelyan's claims. Prior to this phone call, Kazarian had never spoken to Tiomkin about Abelyan's case. Tiomkin informed Kazarian he "had just seen [her] recent post on the Los Angeles County Bar Association's criminal list serve in which [she] recommended the Geragos Firm to another attorney." Tiomkin told Kazarian he "was not contacting [her] in [her] capacity as an attorney for the Geragos Parties, but merely as a colleague of [Geragos] to relay a settlement offer directly to [Geragos] as his previous attempts to resolve the matter with [Kirakosian] had hit a 'dead-end.' " Tiomkin informed Kazarian that Abelyan had not yet filed a State Bar complaint and would settle and refrain from doing so if the Geragos Parties pay $27,500.00. "As an experienced criminal defense attorney, [Kazarian] reasonably

believed that [Tiomkin] was in the commission of criminal extortion." She placed Tiomkin on hold and informed Kirakosian of Tiomkin's call. She then resumed her call with Tiomkin and "legally record[ed] the conversation" to obtain evidence related to the crime of extortion. She confirmed Tiomkin's "previous unrecorded statement" that Abelyan would not file a State Bar complaint if the Geragos Parties returned the $27,500.00 retainer. Tiomkin told her he "didn't know how he could formally put this term into a written settlement agreement, because such a term would not be allowed." Tiomkin thereafter began discussing the merits of the underlying case. "For unknown reasons, the recording briefly stopped and [she] immediately placed [Tiomkin] on hold. [She] immediately began recording again and continued [her] conversation with [Tiomkin]." She then provided the recording to Kirakosian.

V.     *Reply and Evidentiary Objections*

Tiomkin concurrently filed a reply and evidentiary objections to portions of the declarations of Geragos, Qassim, Kirakosian, and Kazarian, as well as to some of the exhibits filed in support of the opposition, including the transcript of the audio recording.

In his reply, Tiomkin argues the Geragos Parties' cross-complaint "is intended purely to gain leverage by turning opposing counsel into a co-defendant." He argues there is no violation of Rule 4.2 and refers to the Geragos Parties' cross-complaint which expressly describes Kazarian as "of the Geragos Firm." Tiomkin also argues the Geragos Parties are required to show criminal extortion as a matter of law for the *Flatley* exception to apply and failed to do so. The reply characterizes the transcript of the audio recording as "partial, selective

14

excerpts" and argues the secret recording is illegal and inadmissible: "[l]awyers are not allowed to record each other to gain advantage in civil cases."  Tiomkin further argues even if "these allegations are believed, stating that a client is unlikely to pursue legal remedies if a case settles is a far cry from criminal extortion."  Tiomkin contends Abelyan "had an absolute right to report the Geragos Parties to the State Bar for mishandling client funds.  Merely implying that Abelyan might file a justified State Bar complaint is not a criminal threat."

Abelyan filed a reply incorporating by reference the evidentiary objections and reply arguments by Tiomkin.

VI.    *Trial Court's Ruling*

On December 10, 2020, after argument, the trial court granted both special motions to strike in their entirety.  The court sustained Tiomkin's objections to the evidence attached to Kirakosian's declaration, "consisting of edited, partial recordings of a phone call secretly taken by" Kazarian without Tiomkin's consent and found the recording and its transcript inadmissible.

As to the first prong, the court found "it is clear that the allegations in the cross-complaint . . . depend upon a 'written or oral statement . . . made in connection with an issue under consideration or review by a . . . judicial body, or any other official proceeding authorized by law.' "  All communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding " 'are per se protected' " and "settlement negotiations are 'protected activity.' "  The court further found the Geragos Parties' evidence is "not sufficient to meet the high burden of producing conclusive evidence of illegal activity, and thus [the] narrow exception [per *Flatley*] does not apply."

15

As to the second prong, the court found *Malin v. Singer* (2013) 217 Cal.App.4th 1283 (*Malin*) dispositive and the "Civil Code section 47 litigation privilege applies as a matter of law." The court found the "entirety of the allegations in the cross-complaint and the gravamen of each cause of action is related to litigation-related communications." It ruled the Geragos Parties cannot demonstrate a probability of prevailing on their causes of action.

Lastly, the trial court found Abelyan, Tiomkin, and the Tiomkin firm "are entitled to recover their fees and costs as established in a properly noticed motion."

The Geragos Parties timely appealed.

## DISCUSSION

I.    *Standard of Review*

We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

We consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) In considering the pleadings and declarations, we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's

16

evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

As for the trial court's rulings on evidentiary objections, we apply the abuse of discretion standard. (*Daimler Trucks North America LLC v. Superior Court* (2022) 80 Cal.App.5th 946, 960.) An erroneous evidentiary ruling requires reversal only if there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. (*Ibid.*)

II.    *Applicable Law*

   A.    <u>The Anti-SLAPP Statute</u>

Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition . . . shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) An " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " is defined in section 425.16 to include, in relevant part: (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law"; (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; or (3) "any other conduct in furtherance of the exercise of the constitutional right of petition . . . ." (*Id.*, subd. (e).)

The Legislature enacted section 425.16 to prevent and deter "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) The purpose of the anti-SLAPP law is "not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) To accomplish this purpose, the Legislature expressly specifies the statute "be construed broadly." (§ 425.16, subd. (a).)

When a party moves to strike a cause of action under the anti-SLAPP law, a trial court evaluates the special motion to strike using a two-prong test: (1) has the moving party "made a threshold showing that the challenged cause of action arises from protected activity" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*)); and, if it has, (2) has the non-moving party demonstrated that the challenged cause of action has "minimal merit" by making "a prima facie factual showing sufficient to sustain" a judgment in its favor? (*Baral, supra*, 1 Cal.5th at pp. 384–385; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93–94 (*Navellier*); see also § 425.16, subd. (b)(1)). After the first prong is satisfied by the moving party, "the burden [then] shifts to the [non-moving party] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, at p. 396.)

B.      Crime of Extortion, Generally

Extortion is not a constitutionally protected form of speech. (*Flatley, supra*, 39 Cal.4th at p. 328.)

18

The Penal Code defines extortion to include "the obtaining of property or other consideration from another, with his or her consent, . . . induced by a wrongful use of force or fear." (Pen. Code, § 518, subd. (a).) Fear, for purposes of extortion, "may be induced by a threat of any of the following: [¶] (1) To do an unlawful injury to the person or property of the individual threatened or of a third person. [¶] (2) To accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime. [¶] (3) To expose, or to impute to him, her, or them a deformity, disgrace, or crime. [¶] (4) To expose a secret affecting him, her, or them. [¶] (5) To report his, her, or their immigration status or suspected immigration status." (Pen. Code, § 519.) "Only threats that fall within one of these [five] categories of section 519 [constitute] extortion." (*People v. Umana* (2006) 138 Cal.App.4th 625, 639; see *Malin, supra*, 217 Cal.App.4th at p. 1299 [demand letter did not fall within *Flatley* exception where it did not fall within any of the § 519 categories].) Every person who, with intent to extort any money or other property from another, sends or delivers to a person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat as specified in Penal Code section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat. (Pen. Code, § 523.)

"Extortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal. '[I]n many blackmail cases, the threat is to do something in itself is perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money.' " (*Flatley, supra*, 39 Cal.4th at p. 326.) Additionally,

19

"threats to do the acts that constitute extortion under Penal Code section 519 are extortionate whether or not the victim committed the crime or indiscretion upon which the threat is based and whether or not the person making the threat could have reported the victim to the authorities or arrested the victim." (*Id*. at p. 327.)

### III.    *Prong 1*: *Arising from Protected Activity*

The Geragos Parties argue the trial court improperly found that Tiomkin's extortion attempts, on behalf of Abelyan, constituted conduct taken in furtherance of their right of petition and "[i]n so finding, . . . improperly sustained an objection to [the Geragos Parties'] uncontroverted, admissible evidence that conclusively established the complained-of illegal extortion."

We conduct our review de novo.

Step one of the anti-SLAPP analysis requires us to decide whether the moving parties—here, Abelyan, Tiomkin and his firm—have shown the claims in the cross-complaint arise from an act in furtherance of Abelyan's constitutional right to petition, i.e., protected activity. (§ 425.16, subd. (b)(1); *Park, supra*, 2 Cal.5th at p. 1061.) "A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park*, at p. 1062.)

It is evident on the face of the cross-complaint that the Geragos Parties' claims are entirely premised on three litigation and/or settlement communications: (1) the email communications between Tiomkin and Kirakosian; (2) the telephone conversation between Tiomkin and Kirakosian; and (3) the telephone conversation between Tiomkin and Kazarian.

There is no question that communications sent in anticipation of litigation or as part of ongoing litigation constitute

legitimate speech or petitioning activity protected under the anti-SLAPP statute. (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 480 ["all communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute"]; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963 [" '[a]n attorney's communication with opposing counsel on behalf of a client regarding pending litigation directly implicates the right to petition and thus is subject to a special motion to strike' "]; *Navellier, supra*, 29 Cal.4th at p. 90 [settlement negotiations are within the scope of § 425.16].)

However, this protection does not extend to communication or conduct that is, as a matter of law, illegal. By contending the communications constituted extortion, the Geragos Parties argue the petitioning activity is unprotected. The watershed case in this regard is *Flatley*.

Flatley was a well-known entertainer and performer who sued attorney Mauro for conduct arising out of his representation of a client (Robertson) who claimed Flatley raped her in his Las Vegas hotel suite. (*Flatley, supra*, 39 Cal.4th at p. 305.) Flatley asserted several causes of action, including civil extortion, based on a demand letter from Mauro. (*Ibid.*) Mauro responded to the suit by filing an anti-SLAPP motion, claiming the demand letter was "a prelitigation settlement offer in furtherance of his constitutional right of petition." (*Id.* at p. 311.)

Our Supreme Court examined the demand letter, which included "threats to publicly accuse Flatley of rape and to report and publicly accuse him of other unspecified violations of various laws unless he 'settled' by paying a sum of money to Robertson of which Mauro would receive 40 percent." (*Flatley, supra*,

39 Cal.4th at p. 329.) "The key passage in Mauro's letter is . . . where Flatley is warned that, unless he settles, 'an in-depth investigation' will be conducted into his personal assets to determine punitive damages and this information will then '**BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT . . . . [¶] Any and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed.** We are positive the media worldwide will enjoy what they find.' " (*Ibid.*) The demand letter's "final paragraph warns Flatley that, along with the filing of suit, press releases will be disseminated to numerous media sources and placed on the Internet." (*Ibid.*) In Mauro's follow-up phone calls, Mauro "named the price of his and Robertson's silence as 'seven figures' or, at minimum, $1 million." (*Ibid.*)

The Supreme Court concluded that Mauro's letter and subsequent phone calls constituted "extortion as a matter of law" and were not constitutionally protected speech or petitioning activities under the anti-SLAPP statute. (*Flatley*, *supra*, 39 Cal.4th at pp. 328, 330 ["These communications threatened to 'accuse' Flatley of, or 'impute to him,' 'crime[s]' and 'disgrace' (Pen. Code, § 519, subds. 2, 3) unless Flatley paid Mauro a minimum of $1 million of which Mauro was to receive 40 percent."].) The threat to disclose "criminal activity entirely unrelated to any alleged injury suffered by Mauro's client 'exceeded the limits of [Mauro's] representation of his client' and is itself evidence of extortion." (*Id.* at pp. 330–331.)

We note two very important distinctions the Supreme Court discussed in *Flatley*. First, it "note[d] that, in the proceedings below, Mauro did not deny that he sent the letter nor

22

did he contest the version of the telephone calls set forth in [the] declarations in opposition to the motion to strike." (*Flatley*, *supra*, 39 Cal.4th at pp. 328–329.)  This is why the Court viewed the evidence as uncontroverted as a matter of law.  (*Id*. at p. 329.) Second, the Court emphasized that its conclusion that Mauro's communications constituted criminal extortion as a matter of law was "based on the *specific and extreme circumstances* of this case." (*Id*. at p. 332, fn. 16, italics added.)  The *Flatley* court stated: "[O]ur opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion." (*Ibid*.)

Unlike Mauro in *Flatley* who conceded the content of the communications (telephone calls and letter), here, Tiomkin does not concede that he engaged in extortionate or illegal conduct as alleged by the Geragos Parties.  Thus, the applicability of the *Flatley* exception hinges on whether the Geragos Parties provided uncontroverted evidence conclusively showing Abelyan and/or Tiomkin committed extortion as a matter of law.  In analyzing the three litigation/settlement communications raised in the cross-complaint, we bear in mind the Supreme Court's comment in *Flatley* that it found extortion as a matter of law "based on the specific and extreme circumstances" of that case. (*Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16.)

A.    Telephone conversation between Tiomkin and Kirakosian

The Geragos Parties' cross-complaint alleged that Kirakosian called Tiomkin on August 14, 2020, at which time Tiomkin "discuss[ed] the immediate filing of a State Bar

23

complaint against the Geragos Firm." Kirakosian requested Tiomkin "refrain from making such veiled threats." The conversation ended when Tiomkin stated the Geragos Firm should return the $27,500 back to Abelyan "or Abelyan would be immediately filing a State Bar complaint."

The evidence about the August 14, 2020 telephone conversation includes Kirakosian's declaration submitted in support of the Geragos Parties' opposition and Tiomkin's declaration submitted in support of his and Abelyan's special motions to strike. Kirakosian declared Tiomkin "unequivocally stated that his client would be filing a State Bar complaint if the matter wasn't promptly resolved," whereas Tiomkin declared that at no point during the discussion did he threaten to report the Geragos Parties to the State Bar or to pursue State Bar proceedings against them.

The declarations provide conflicting accounts of what was said during the August 14, 2020 telephone conversation. We do not solely rely on the Geragos Parties' or Kirakosian's declarations. (*Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 837 (*Flickinger*) [their "subjective and self-serving interpretation cannot establish extortion as a matter of law"].) The declarations provided by both sides create a genuine issue of material fact (*Soukup*, *supra*, 39 Cal.4th at p. 286) and in no way qualify as uncontroverted evidence that conclusively establishes criminal extortionate conduct by Tiomkin.

B.     Email communication between Tiomkin and Kirakosian

The cross-complaint alleged Tiomkin raised the issue of State Bar violations to Kirakosian via email on August 13 and 14,

2020, and made veiled threats to report the Geragos Parties to the State Bar unless they paid $27,500.

The evidence as to this includes Tiomkin's declaration in support of the anti-SLAPP motion, Kirakosian's declaration in support of the opposition to the motion, and copies of the emails which were attached as exhibits to their declarations.

Tiomkin's emails sent August 13 and 14, 2020 provide, in relevant part:

- "I appreciate your admission that your client stole $27,500 of my client's funds for unspecified 'investigation' services. . . . [¶] . . . [¶] Also, as long as you are providing documentation, would you provide all documents concerning relevant State Bar investigations of Mr. Geragos and his associates pertaining to his theft of client funds?"
- "Setting aside the fact that the 'fee agreement' violates multiple State Bar rules, . . . . [¶] . . . [¶] . . . I would be fascinated to learn what 'investigation' Mr. Geragos performed for $27,500. . . . I think that you should familiarize yourself with the State Bar's position on true retainers, if this is going to be Mr. Geragos' defense."
- "I . . . inquired about whether Mr. Geragos was going to be available for deposition, given his indictment as an unnamed co-conspirator in the Avenatti case, and the possibility that he might be in federal custody in the near future. You said that you were aware of the federal investigation, but that at this point, no charges have bee filed against Geragos. [¶] I also asked if you were aware of a State Bar investigation

25

related to Geragos' theft of Mr. Abelyan's funds. You stated that there are multiple inquiries involving Geragos and you were not going to get into them."

- "I hope Mr. Geragos is staying well. Has he managed to remain out-of-custody?"

The Geragos Parties argue "Tiomkin's veiled threats in emails to Kirakosian . . . constitute documented evidence of extortion that is undisputed." They contend the facts of this case are analogous to *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799 (*Mendoza*) and *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405 (*Stenehjem*). We briefly recite their facts.

In *Mendoza*, Mendoza received a demand letter from attorney Hamzeh sent on behalf of his client, Mendoza's former employer. The letter provides: " 'We are in the process of uncovering the substantial fraud, conversion, and breaches of contract that [Mendoza] has committed on my client. . . . To date[,] we have uncovered damages exceeding $75,000 . . . . If [you do] not agree to cooperate with our investigation and *provide us with a repayment of such damages caused*, we will be forced to proceed with filing a legal action . . . as well as reporting [you] to the California Attorney General, the Los Angeles District Attorney, [and] the Internal Revenue Service.' " (*Mendoza*, *supra*, 215 Cal.App.4th at p. 802, italics added.) The reviewing court held that the demand letter constituted extortion as a matter of law because it involved a threat to report criminal conduct coupled with a demand for money. (*Id*. at p. 806.)

In *Stenehjem*, the cross-defendant litigant sent an email (the purported settlement demand) that "threatened to expose Sareen [(his former employer's CEO)] to federal authorities for alleged violations of the False Claims Act *unless he negotiated a*

26

*settlement of Stenehjem's private claims,*" including defamation and wrongful termination. (*Stenehjem*, *supra*, 226 Cal.App.4th at p. 1423, italics added.) The email demand "mentioned a potential qui tam suit . . . and referred to potential involvement of the United States Attorney General, Department of Justice, and Department of Defense." (*Id.* at pp. 1409–1410.) The *Stenehjem* court found that the absence of an express threat or a demand for a specific sum of money in the email did not negate its fundamental nature as an extortionate writing. (*Id.* at p. 1424.)

We find these cases inapposite. Nowhere in Tiomkin's emails do we find a threat to file a State Bar claim *coupled with a demand for money*. In addition, unlike the alleged criminal activity that the cross-defendant litigant in *Stenehjem* threatened to expose in a qui tam action, which was " 'entirely unrelated' " to any alleged injury suffered by him in his defamation and wrongful termination claims (*Stenehjem*, *supra*, 226 Cal.App.4th at p. 1423), Tiomkin's communications were related to the alleged injury his client suffered (i.e., breach of contract and promissory fraud claims for payment of a retainer to an attorney for services which were never rendered).

We agree with Abelyan and Tiomkin that *Malin* is dispositive. In *Malin*, attorney Singer sent a demand letter to his client's business associates Malin and Moore, announcing his client's intention to sue them for numerous wrongs. He attached to the demand letter a copy of the draft complaint with claims for embezzlement, breach of fiduciary duty, and conversion. (*Malin*, *supra*, 217 Cal.App.4th at p. 1289.) Singer accused Malin of embezzling and misusing company resources to arrange sexual liaisons with older men such as "Uncle Jerry," a judge whose name was redacted, with a photo of the judge. (*Ibid*.) The letter

specified that Singer's client " 'will file the Complaint against you and your other joint conspirators unless this matter is resolved to [the] client's satisfaction within five (5) business days.' " (*Ibid.*) Malin sued for civil extortion, among other claims, and Singer and his client moved to strike Malin's complaint pursuant to the anti-SLAPP statute. (*Id.* at p. 1290.)

The reviewing court concluded Singer's demand letter was protected communication in anticipation of litigation and did not constitute criminal extortion as a matter of law "under the narrow exception articulated in *Flatley*." (*Malin, supra,* 217 Cal.App.4th at pp. 1294, 1299.) The court reasoned that "[i]n contrast with the demand letters in *Flatley* and *Mendoza*, Singer's demand letter did not expressly threaten to disclose Malin's alleged wrongdoings to a prosecuting agency or the public at large." (*Id.* at p. 1298.) The court further found the "secret" that would allegedly expose Malin to disgrace was inextricably tied to Singer's client's pending complaint, as the demand letter accused Malin of embezzling money and simply informed him that Singer's client knew how he had spent those funds. (*Id.* at p. 1299.)

As in *Malin*, we conclude Tiomkin's comments did not fall under the narrow *Flatley* exception. Misappropriation of client funds is the gravamen of the civil action against the Geragos Parties. If a threat to report such conduct to the State Bar was made, it had a reasonable connection to the underlying dispute and therefore is not comparable to the "extreme" conduct found unprotected by *Flatley*.

The Geragos Parties' contention that Tiomkin's communications violated rule 3.10(a), which prohibit an attorney from "threaten[ing] to present criminal, administrative, or

28

disciplinary charges to obtain an advantage in a civil dispute," does not establish that those communications constituted criminal extortion as a matter of law. Even assuming the Geragos Parties could establish Tiomkin had violated rule 3.10(a), that violation would not constitute criminal conduct within the narrow *Flatley* exception, which is limited to criminal conduct and not a violation of the Rules of Professional Conduct or a civil statute. (See *Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 806 [court's use in *Flatley* of the phrase "illegal" was intended to mean criminal, and not merely violative of a statute]; see *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1169 ["Conduct in violation of an attorney's duties of confidentiality and loyalty to a former client cannot be 'illegal as a matter of law' " under the *Flatley* exception]; see also *Flickinger*, *supra*, 85 Cal.App.5th at p. 836 ["The *Flatley* court could have, but did not, limit its analysis to the fact that the threat was itself a breach of ethical rules."].)

Finally, while the Geragos Parties argue Tiomkin threatened "criminal charges against Geragos" by asking whether Geragos has "managed to remain out-of-custody" in one of his emails to Kirakosian, a review of the entire email thread makes apparent Tiomkin's question is in reference to the allegations surrounding the Avenatti matter. In *Flatley*, the Supreme Court cautioned that "rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing" do not "necessarily constitute extortion." (*Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16.) This rings true here, as a review of the emails make clear both attorneys were zealously, aggressively, and somewhat

29

rudely representing their respective clients. While the email communications do not portray the professional civility and decorum we would hope for, it in no way amounts to a conclusive showing of extortion as a matter of law. As stated in *Flickinger*, *supra*, 85 Cal.App.5th at p. 836, "[w]e read *Flatley* as permitting a finding of extortion as a matter of law only where an attorney's threats fall *wholly outside the bounds of professional norms*." (Italics added.) That is not the case with these emails.

C.    <u>Telephone communication between Tiomkin and Kazarian</u>

We preliminarily address the partial audio recording (and transcript), which the Geragos Parties argue is admissible. We conclude the trial court did not err in finding the audio recording inadmissible.

Penal Code section 632, subdivision (a) provides: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic . . . recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a . . . telephone . . . shall be punished." (Pen. Code, § 632, subd. (a).) Penal Code section 632, subdivision (d) specifies: "Except as proof in an action or prosecution for violation of this section, evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding." (Pen. Code, § 632, subd. (d).)

The Geragos Parties contend for the first time on appeal that Kazarian's recording is not governed by Penal Code section 632 because her conversation with Tiomkin was not a

confidential communication. "Tiomkin contacted Kazarian—a third-party to this action who does not represent any of the parties involved and had no prior knowledge of this dispute—in order to convey a message to her colleague" and thus does not " 'reasonably indicate [Tiomkin] desire[d] it to be confined' " to the parties involved.

This argument fails for two reasons. First, the record on appeal makes clear that the Geragos Parties did not raise this argument before the trial court. " 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.' " (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.)

Second, the Geragos Parties' representation that Kazarian was "a third-party . . . who does not represent any of the parties involved and had no prior knowledge of this dispute" is not well taken. Their cross-complaint expressly states Kazarian is "of the Geragos Firm" and "a representative of the Geragos Firm." A litigant is bound by facts pleaded in a verified complaint. (*Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1416; see *Brecher v. Gleason* (1972) 27 Cal.App.3d 496, 499, fn. 1 ["A verified assertion in a pleading is a conclusive concession of the truth of the matter pleaded."].)

The Geragos Parties next contend Penal Code section 633.5 exempts Kazarian's recording from exclusion by Penal Code section 632 because Kazarian "initiated the recordings to obtain evidence that she reasonably believed would show Tiomkin committing extortion." Penal Code section 633.5 provides that

31

section 632 does "not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person, [and] *do[es] not render any evidence so obtained inadmissible in a prosecution for extortion, kidnapping, bribery, . . . or any crime in connection therewith.*" (Pen. Code, § 633.5, italics added.)

Thus, Penal Code section 633.5's express language narrowly permits use of a recording of a confidential communication "*in a prosecution for* extortion, kidnapping, bribery" and other expressly specified crimes. Nevertheless, the Geragos Parties argue Penal Code section 633.5 also allows for its use *in civil actions.* We have reviewed the case authority the Geragos Parties have cited and find that none specify that nonconsensual recordings are admissible evidence in civil actions. Indeed, *PPFA v. Center for Medical Progress* (2016) 214 F.Supp.3d 808, 854, one of the cited cases, provides that Penal Code section 633.5 "is an affirmative defense to liability under [Penal Code] section 632" and does not stand for the proposition that unconsented recordings are admissible evidence in civil actions.

Accordingly, the Geragos Parties fail to show an abuse of discretion by the trial court in ruling the partial audio recording inadmissible in the civil action.

Without the recording, the only evidence about the telephone conversation between Tiomkin and Kazarian are their respective declarations, which result in a he-said-she-said conflict as to what was actually said. This does not equate to conclusive

32

evidence of extortion as a matter of law. "If . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley*, *supra*, 39 Cal.4th at p. 316.)

We find none of these communications presents extortion as a matter of law. We conclude Tiomkin and Abelyan made the threshold showing that the Geragos Parties' cross-complaint is based on protected activity and thus subject to the anti-SLAPP statute.

IV. *Prong 2: Probability of Prevailing*

We proceed to prong two of the anti-SLAPP analysis— whether the Geragos Parties carried their burden of establishing a probability of prevailing on the causes of action of their cross-complaint.

The principal difficulty the Geragos Parties face in showing a probability of prevailing on their claims is California's litigation privilege codified in Civil Code section 47, subdivision (b). Regardless of whether the Geragos Parties have generally averred the elements of the five causes of action in their cross-complaint, they cannot rebut Tiomkin's and Abelyan's litigation privilege defense.

The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of harassment in subsequent derivative actions. (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 958 (*Gallegos*).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other

33

participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)  The privilege is an absolute privilege and bars all tort cases of action except a claim of malicious prosecution.  (*Flatley*, *supra*, 39 Cal.4th at p. 322.)  The privilege has been applied in "numerous cases" involving "fraudulent communication or perjured testimony." (*Silberg*, at p. 218.)  The litigation privilege protects even communication made with an intent to harm, so long as the communication is made in "relation" to a pending/ongoing or genuinely contemplated judicial or other official proceeding.  (Civ. Code, § 47, subd. (b); *Gallegos*, at pp. 958–959; *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1302 [the litigation privilege applies "regardless of the existence of malice or intent to harm"].)

The litigation privilege is "not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." (*Rusheen*, *supra*, 37 Cal.4th at p. 1057.)  A prelitigation communication is privileged only if it relates to litigation that is contemplated in good faith and under serious consideration.  (*Flickinger*, *supra*, 85 Cal.App.5th at p. 840.)  The requirement of good faith contemplation and serious consideration provides some assurance that the communication has some connection or logical relation to a contemplated action and is made to achieve the objects of the litigation.  (*Ibid*.)  Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact.  (*Ibid*.)

For instance, in *Malin*, *supra*, 217 Cal.App.4th at p. 1301, the reviewing court explained, "In order for a prelitigation

communication such as [attorney] Singer's demand letter to be privileged under Civil Code section 47, subdivision (b), it must 'relate[] to litigation that is contemplated in good faith and under serious consideration.' " The court then found the litigation privilege did apply to Singer's demand letter, "given the similarity of the sexual misconduct allegations in both the letter and subsequent complaint." (*Ibid*.) The court concluded the demand letter is protected by the privilege as it was "logically connected to litigation that was contemplated in good faith and under serious consideration when the letter was sent." (*Id*. at p. 1302.) Similarly, in *Flickinger*, *supra*, 85 Cal.App.5th at p. 840, we found the litigation privilege applied to the defendant's prelitigation letter as it "related to litigation threatened by plaintiff against defendant's client" and "bore a connection or logical relation to the litigation and advanced [the defendant's client's] interest in avoiding the litigation."

Here, the cross-complaint is based on discussions between counsel—via email and telephone call—where a potential State Bar complaint was referenced in connection with a pending lawsuit. The communication thus meets the criteria stated in *Malin* and in *Flickinger*—it bears a connection or logical relation to ongoing litigation initiated by Abelyan via his civil complaint and his counsel Tiomkin's efforts to settle and avoid further litigation. In addition, the communication complained of was made in relation to not just an ongoing civil lawsuit, but a potential State Bar action as well. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913 [the litigation privilege " 'includes statements made to initiate official action' "].) Geragos's declaration, submitted in support of the Geragos Parties' opposition, provides that Abelyan and/or Tiomkin indeed

submitted "allegations against [Geragos] and [Qassim] to the State Bar." Thus, there can be no doubt that Abelyan *genuinely contemplated* this State Bar action, which is the pivotal issue as to the applicability of the litigation privilege in the context of demands made prior to the actual commencement of threatened recourse. (See *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251; *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1489–1490.)

The Geragos Parties also contend we "should reverse the determination of the [t]rial [c]ourt and hold that the litigation privilege does not apply to Tiomkin's communication with Kazarian." They argue Kazarian did not represent the Geragos Parties and did not have a substantial interest in this matter. However, as already discussed in the preceding section, the cross-complaint expressly states Kazarian is "a representative of the Geragos Firm."

In short, given the absolute nature of the litigation privilege, the Geragos Parties did not carry their burden of showing a probability of overcoming Tiomkin's and Abelyan's litigation privilege defense. Accordingly, the trial court properly granted the special motions to strike the cross-complaint.

V.     *Attorney Fees*

Lastly, the Geragos Parties' sole basis for challenging the award of attorney fees and costs to Tiomkin and Abelyan under section 425.16, subdivision (c) is that the trial court erred in granting the anti-SLAPP motion. Because we affirm the order granting the anti-SLAPP motion, we also affirm the award of attorney fees and costs.

36

Abelyan and Tiomkin request that we award them attorney fees on appeal.  They may request an award of attorney fees by a properly filed motion with the trial court.

## DISPOSITION

The trial court's order sustaining respondents' evidentiary objections is affirmed.  The order granting the anti-SLAPP motion is affirmed.  The trial court's attorney fee award made pursuant to section 425.16, subdivision (c) is also affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


**CERTIFIED FOR PUBLICATION**



STRATTON, P. J.

We concur:



GRIMES, J.          HARUTUNIAN, J.[*]

---

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.